# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                      No. CR 19-4367 JB

JESSICA PANGBURN,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the United States' Combined Objections to Presentence Report and Sentencing Memorandum, filed April 9, 2020 (Doc. 19)("U.S. Objections"); and (ii) the Objection to Presentence Report, filed April 21, 2020 (Doc. 21)("Pangburn Objections"). The primary issues are: (i) whether Defendant Jessica Pangburn used sophisticated means to embezzle $69,469.12 from her employer, the International Union of Operating Engineers Local 953 ("Local 953"), such that she is subject to a 2-level enhancement under the United States Sentencing Guidelines Manual ("U.S.S.G." or "Guidelines") § 2B1.1(b)(10)(C); and (ii) whether Pangburn's offense involved abuse of a position of special trust such that U.S.S.G. § 3B1.1's 2-level enhancement applies. The Court concludes that: (i) § 2B1.1(b)(10)(C) does not apply, because Pangburn's offense did not require special skill and she did not employ sophisticated means to avoid detection; and (ii) § 3B1.1 does not apply, because Pangburn's position as Local 953's office manager lacks the substantial discretion inherent in a position of public or private trust. Accordingly, the Court sustains the U.S. Objections and the Pangburn Objections.

**FACTUAL BACKGROUND**

The Court takes its facts from the Plea Agreement, filed November 26, 2019 (Doc. 4), and the Presentence Investigation Report, filed March 19, 2020 (Doc. 16)("PSR").  Neither party objects to the facts that Pangburn admits in the Plea Agreement or to the facts that the PSR provides.  See Pangburn Objections at 2; United States' Objections at 2.  In 2017, Pangburn worked as the office manager for Local 953 in Albuquerque, New Mexico.  See Plea Agreement ¶ 8, at 3. One of her duties consisted of using QuickBooks, an accounting software program, to arrange weekly salary payments to Local 953's employees.  See Plea Agreement ¶ 8, at 3.  Pangburn would make "entries in the accounting software that were electronically transferred to the payroll vendor who provided the software," and the payroll vendor would deposit the money in the employees' bank accounts.  Plea Agreement ¶ 8, at 3-4.  Local 953 had its account with United Business Bank, and QuickBooks routed the salary payments by interstate wire transfers through the Automated Clearing House.  See Plea Agreement ¶ 9, at 4.  Pangburn has no accounting experience.  See PSR ¶¶ 88-93, at 15.  No Local 953 employees regularly reviewed or supervised Pangburn's QuickBooks entries.  See Plea Agreement ¶ 8, at 4.

Beginning in July, 2017, Pangburn arranged additional payments to herself through the same method that she used to make weekly wage payments for all Local 953 employees.  See Plea Agreement ¶ 9, at 4.  She "made the additional payments the same amount as [her] normal salary because it was easier to set up in the accounting software that way."  Plea Agreement ¶ 9, at 4. After each such entry, QuickBooks automatically withdrew money from Local 953's bank account and directly deposited the money in Pangburn's bank account.  See Plea Agreement ¶ 9, at 4.  In all, Pangburn directed over eighty payments beyond her earned wages.  See Plea Agreement ¶ 10, at 4.  These payments amounted to $69,046.37.  See Plea Agreement ¶ 10, at 4.  Because

QuickBooks charges a fee for each transaction, Pangburn's unauthorized payments cost Local 953 an additional $422.75 in fees.  See Plea Agreement ¶ 10, at 11.

In July and August, 2018, Pangburn voided these extra transactions in QuickBooks.  See PSR ¶ 18, at 5.  These transactions still were listed in QuickBooks but were listed as "void."  PSR ¶ 18, at 5; Objections at 3; U.S. Objections at 2.  Pangburn also stopped making Local 953's weekly tax payments to the United States Internal Revenue Service ("IRS"), payments to the International Union of Operating Engineers and various pension, health, and payments to welfare funds for Local 953's employees.  See PSR ¶ 18, at 5.  Because Local 953's checking account typically held less than $100,000.00, making these scheduled payments in addition to the extra payments to Pangburn would have quickly depleted the account.  See PSR ¶ 18, at 5.  Pangburn disputes that she ceased making these scheduled payments to avoid detection, and asserts, instead, that "the missed payment to the IRS and the reduced [pension] contributions came from a lack of training." Objections at 3.  Additionally, the PSR notes that Local 953 had previously overpaid the IRS.  See PSR ¶ 18, at 5.

Towards the end of Local 953's fiscal year, Local 953's accountant requested the QuickBooks transaction history from Pangburn, who "delayed the process stating she was working on it, but too busy to get him the information quickly."  PSR ¶ 18, at 5.  When Pangburn gave the accountant the QuickBooks account, the accountant "quickly saw there was a significant liability which should not have existed" and attributed that liability to Pangburn's extra payments.  PSR ¶ 19, at 5.  The accountant told Local 953's business manager, and together they confronted Pangburn on September 27, 2018.  See PSR ¶ 19, at 5.  Pangburn quickly admitted to the unauthorized payments, "stating she had some financial troubles and things had gotten out of hand."  PSR ¶ 19, at 5.  "Pangburn did not seem surprised to have been caught but was surprised

at the total amount of unauthorized payments." PSR ¶ 19, at 5. Pangburn said that she "had not determined the total she had taken because she was 'scared to death' to know." PSR ¶ 24, at 6 (quoting Pangburn). Insurers have compensated Local 935 for the theft. See PSR ¶ 25, at 6.

## PROCEDURAL BACKGROUND

Pangburn pleads guilty to one count of wire fraud in violation of 18 U.S.C. § 1343. See Plea Agreement ¶ 3, at 2. The United States Probation Office ("USPO") calculates a base offense level of 7 under U.S.S.G. § 2B1.1(a)(1), adds a 6-level increase for the amount that Pangburn stole, adds a 2-level increase under § 2B1.1(b)(10)(C) for Pangburn's allegedly sophisticated means in concealing the offense, and a 2-level increase under § 3B1.3 for Pangburn's alleged abuse of a position of public or private trust. See PSR ¶¶ 41-48, at 9. Because Pangburn clearly has accepted responsibility and assisted authorities in investigating the offense, the USPO decreases the total offense level by 3 points under § 3E1.1(a) and (b). See PSR ¶¶ 50-51, at 9-10. The USPO thus calculates a total offense level of 14. See PSR ¶ 52, at 10. Both the United States and Pangburn object to the §§ 2B1.1(b)(10)(C) and 3B1.3 enhancements. See U.S. Objections at 2-3; Objections at 4. The USPO responds that Pangburn took "extra steps . . . in an effort to hide the extra payments and avoid detection" by voiding the unauthorized payments and stopping scheduled payments to the IRS, the International Engineering Union, and Local 953's pension accounts. See Addendum to the Presentence Report at 2, filed May 18, 2020 (Doc. 25)("Addendum"). The USPO also asserts that Local 953 entrusted Pangburn with sole responsibility to make wage, tax, and pension payments. See Addendum at 3. Accordingly, the USPO maintains that the enhancements are applicable. See Addendum at 3.

## LAW REGARDING THE GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States of America severed the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-473, 98 Stat. 1976, thus making Guidelines sentencing ranges effectively advisory.  In excising the two sections, the Supreme Court left the remainder of the Sentencing Reform Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing.  Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."  United States v. Booker, 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)    to afford adequate deterrence to criminal conduct;
>
> (C)    to protect the public from further crimes of the defendant; and
>
> (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551.  To achieve these purposes, § 3553(a) directs sentencing courts to consider:

(i) the Guidelines; (ii) the nature of the offense and of the defendant's character; (iii) the available

sentences; (iv) the policy favoring uniformity in sentences for defendants who commit similar crimes; (v) the need to provide restitution to victims; and (vi) any pertinent United States Sentencing Commission policy statements in effect on the date of sentencing.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court and the United States Court of Appeals for the Tenth Circuit have clarified that, while the Guidelines are one of several factors which § 3553(a) enumerates, they are entitled to careful consideration.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many").  They are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses."  United States v. Cage, 451 F.3d at 593 (internal quotation marks omitted)(quoting United States v. Terrell, 445 F.3d 1261, 1265 (10th Cir. 2006)).  A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a).  See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable."  United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. at 349, as recognized in United States v. Zamora-Solorzano, 528 F.3d 1247, 1251 n.3 (10th Cir.

2008).  This presumption, however, is an appellate presumption, and not one that the trial court can or should apply.  See Gall v. United States, 552 U.S. 38, 46-47 (2007); Kimbrough v. United States, 552 U.S. 85, 90-91 (2007); Rita v. United States, 551 U.S. at 351.  Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the advisory[1] Guidelines sentence.  See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first

---

[1]Attorneys and courts often say that the "Guidelines" are advisory, but it appears more appropriate to say that the resulting Guidelines ranges are advisory.  Gall v. United States, 552 U.S. at 46 ("As a result of our decision [in United States v. Booker], the Guidelines are now advisory . . . ."); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)(unpublished)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory.").  The Court must consider the Guidelines, see Gall v. United States, 552 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the Guidelines range, see Gall v. United States, 552 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.").  The Court is not mandated, however, to apply a sentence within the calculated Guidelines range.  See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . .").  Accord United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole. The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

. . . .

task remains to accurately and correctly determine the advisory-guideline sentence. Thus, before the sentencing court takes up a defendant's <u>Booker</u> arguments, the sentencing court must first determine whether the defendant is entitled to downward departures. The sentencing court may, however, also use these same departure factors in the <u>Booker</u> calculus, even if the court does not grant a downward departure.

<u>United States v. Apodaca-Leyva</u>, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb. 13, 2008)(Browning, J.). The Supreme Court has recognized, however, that sentencing judges are "in a superior position to find facts and judge their import under § 3553(a) in each particular case." <u>Kimbrough v. United States</u>, 552 U.S. at 89. Applying § 3553(a)'s factors, the Court has concluded that the case of an illegal immigrant who re-entered the United States to provide for his two children and two siblings was not materially different from other re-entry cases, and, thus, no

---

The Supreme Court held in <u>United States v. Booker</u> that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in <u>Kimbrough v. United States</u> that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted). In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield. In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their <u>United States v. Booker</u>-granted authority to post-Guidelines analysis "variances." <u>Irizarry v. United States</u>, 553 U.S. 708, 710-16 (2008). A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably. <u>See</u> <u>Gall v. United States</u>, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, <u>such as failing to calculate (or improperly calculating) the Guidelines range</u>, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

<u>United States v. Nolf</u>, 30 F. Supp. 3d 1200, 1222-24, (D.N.M. June 20, 2014)(Browning, J.)(emphasis in original).

variance from the Guidelines sentence was warranted.  See <u>United States v. Almendares-Soto</u>, No. CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M. Dec. 14, 2010)(Browning, J.).  On the other hand, in <u>United States v. Jager</u>, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. Feb. 17, 2011)(Browning, J.), although the defendant's military service was not present to an unusual degree and, thus, did not warrant a departure, the Court concluded that a variance was appropriate, because the defendant's military service was "superior and uniformly outstanding," as the defendant appeared to have been "trustworthy[] and dedicated, and he served with distinction." 2011 WL 831279, at *14.

## LAW REGARDING THE BURDEN OF PROOF REQUIRED FOR ENHANCEMENTS UNDER THE GUIDELINES

In <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000)("<u>Apprendi</u>"), the Supreme Court reaffirmed the principle that it is permissible for sentencing judges "to exercise discretion -- taking into consideration various factors relating both to offense and offender -- in imposing judgment within the range prescribed by statute." 530 U.S. at 481.  The Supreme Court cautioned, however, that the Constitution of the United States of America limits this discretion and the Sixth Amendment to the Constitution requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." <u>Apprendi</u>, 530 U.S. at 490.  In <u>Blakely v. Washington</u>, 542 U.S. 296 (2004), the Supreme Court elaborated on its holding in <u>Apprendi</u>, stating that the "'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." <u>Blakely v. Washington,</u> 542 U.S. at 303 (emphasis and citations omitted).  In <u>United States v. Booker</u>, however, the Supreme Court held that, because the sentencing guidelines are no

longer mandatory, "*Apprendi* does not apply to the present advisory-Guidelines regime." United States v. Ray, 704 F.3d 1307, 1314 (10th Cir. 2013). See United States v. Booker, 543 U.S. at 259 ("[W]ithout this provision [of the Guidelines statute] -- namely, the provision that makes the relevant sentencing rules mandatory and imposes binding requirements on all sentencing judges -- the statute falls outside the scope of *Apprendi*'s requirement." (alterations and internal quotations marks omitted)). More recently, the Supreme Court held that the requirements in Apprendi v. New Jersey apply to facts that increase a defendant's mandatory minimum sentence. See Alleyne v. United States, 570 U.S. 99, 103 (2013).

In United States v. Magallanez, 408 F.3d 672 (10th Cir. 2005), the Tenth Circuit held that Blakely v. Washington and United States v. Booker did not change the district court's enhancement findings analysis. See United States v. Magallanez, 408 F.3d at 684-85. United States v. Magallanez involved plain-error review of a drug sentence in which a jury found the defendant guilty of conspiracy to possess with intent to distribute, and of distributing, methamphetamine. See 408 F.3d at 676. As part of its verdict, the jury, through a special interrogatory, attributed to the defendant 50-500 grams of methamphetamine; at sentencing, however, the judge -- based on testimony of the various amounts that government witnesses indicated they had sold to the defendant -- attributed 1200 grams of methamphetamine to the defendant and used that amount to increase his sentence under the Guidelines. See 408 F.3d at 682. The district court's findings increased the defendant's Guidelines sentencing range from 63 to 78 months to 121 to 151 months. See 408 F.3d at 682-83. On appeal, the Tenth Circuit stated that, both before and after Congress' passage of the Sentencing Reform Act, "sentencing courts maintained the power to consider the broad context of a defendant's conduct, even when a court's view of the conduct conflicted with the jury's verdict." 408 F.3d at 684. Although United States

v. Booker made the Guidelines ranges "effectively advisory," the Tenth Circuit reaffirmed that "district courts are still required to consider Guideline ranges, which are determined through application of the preponderance standard, just as they were before." United States v. Magallanez, 408 F.3d at 685 (citation omitted).

The Tenth Circuit, while "recognizing 'strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof,'" has "long held that sentencing facts in the 'ordinary case' need only be proven by a preponderance." United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)(quoting United States v. Washington, 11 F.3d 1510, 1516 (10th Cir. 1993)).[2] "[T]he application of an enhancement . . . does not implicate

---

[2]Although the Tenth Circuit stated in United States v. Washington that "the issue of a higher than a preponderance standard is foreclosed in this circuit," 11 F.3d at 1516, the Tenth Circuit has since classified its holding as leaving "open the possibility that due process may require proof by clear and convincing evidence before imposition of a Guidelines enhancement that increases a sentence by an 'extraordinary or dramatic' amount," United States v. Ray, 704 F.3d at 1314 (quoting United States v. Olsen, 519 F.3d at 1105). See United States v. Olsen, 519 F.3d at 1105 (affirming the use of the preponderance-of-the-evidence standard for sentencing facts that increase a sentence in the "'ordinary case'" (quoting United States v. Washington, 11 F.3d at 1516)). The Tenth Circuit has not yet found that an "extraordinary or dramatic" instance warrants a higher standard of proof for certain facts that enhance a defendant's sentence. United States v. Olsen, 519 F.3d at 1105 (explaining that it need not determine whether a higher standard of proof is required to sentence a defendant for committing perjury in relation to a grand jury investigation, because the enhancement did not require the district court to determine that the defendant committed murder, but only that he obstructed a homicide investigation). See United States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(affirming a preponderance-of-the-evidence standard for facts that enhance a defendant's offense level 4 levels); United States v. Valdez, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the defendant's argument that a dramatic increase in a sentence because of a sentencing judge's finding of additional amounts of methamphetamine associated with acquitted charges entitled the defendant to a clear-and-convincing evidence standard at sentencing, and noting that the Tenth Circuit "foreclosed by binding precedent" this argument); United States v. Washington, 11 F.3d at 1516 (finding that a district court need not find by any more than a preponderance of the evidence the amount of cocaine a defendant distributed, even though its findings increased the defendant's sentence from twenty years to consecutive forty-year terms).

the Supreme Court's holding in Apprendi v. New Jersey." United States v. Reyes-Vencomo, No. CR 11-2563 JB, 2012 WL 2574810, at *3 (D.N.M. June 26, 2012)(Browning, J.). The Tenth Circuit applies Apprendi v. New Jersey's requirement that a fact be submitted to a jury only where the fact would increase a defendant's sentence "above the statutory maximum permitted by the statute of conviction." United States v. Price, 400 F.3d 844, 847 (10th Cir. 2005). Accord United States v. Ray, 704 F.3d at 1314. A defendant may assert an error under Apprendi v. New Jersey only where the fact at issue increased his sentence beyond the statutory maximum. See United States v. O'Flanagan, 339 F.3d 1229, 1232 (10th Cir. 2003)(holding that a defendant could not assert an error under Apprendi v. New Jersey, because "his sentence does not exceed the statutory maximum"); United States v. Hendrickson, 2014 WL 6679446, at *6 (10th Cir. 2014)[3](holding that, after Alleyne v. United States, "[i]t is well-established that sentencing factors need not be charged in an indictment and need only be proved to the sentencing judge by a preponderance of the evidence"). The Court has noted:

> [A]lthough the decision of the Supreme Court of the United States in Alleyne v. United States, . . . 133 S. Ct. 2151 . . . (2013), expands the rule from Apprendi v.

_____

[3]United States v. Hendrickson is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . [a]nd we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that United States v. Hendrickson, and United States v. Leroy, 298 F. App'x 711 (10th Cir. 2008), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

New Jersey, 530 U.S. 466 . . . (2000)(holding that facts that increase the maximum
sentence a defendant faces must be proven to a jury beyond a reasonable doubt), to
cover facts that increase the mandatory minimum sentence, as well as the maximum
sentence, it does not prohibit district judges from continuing to find advisory
sentencing factors by a preponderance of the evidence.  See [United States v.
Sangiovanni,] 2014 WL 4347131, at *22-26 [(D.N.M. 2014)(Browning, J.)].

United States v. Cervantes-Chavez, No. CR 14-0259 JB, 2014 WL 6065657, at *14 (D.N.M. Nov.

3, 2014)(Browning, J.).

## ANALYSIS

The Court sustains the U.S. Objections and the Pangburn Objections.  Although both the

United States and Pangburn assert that §§ 2B1.1(b)(10)(C) and 3B1.3 do not apply, the Court

makes an independent assessment to determine whether the USPO is correct.  The Court first

concludes that Pangburn did not use sophisticated means in committing or concealing her offense.

Second, the Court concludes that Pangburn did not abuse a position of special private trust in

committing the offense.

## I.      THE COURT SUSTAINS THE OBJECTIONS TO THE § 2B1.1(b)(10)(C) ENHANCEMENT.

The Court first concludes that the 2-level enhancement under § 2B1.1(b)(10)(C) does not

apply to Pangburn's offense.  Section 2B1.1(b)(10)(C) provides that, "[i]f the offense involves

sophisticated means, increase by 2 levels.  If the resulting offense is less than level 12, increase to

level 12."  U.S.S.G. § 2B1.1(b)(10)(C).  The Application Note to § 2B1.1(b)(10)(C) defines

"sophisticated means" as "especially complex or especially intricate offense conduct pertaining to

the execution or concealment of an offense. . . .  Conduct such as hiding assets or transactions, or

both, through the use of fictitious entities, corporate shells, or offshore financial accounts . . .

ordinarily indicates sophisticated means."  U.S.S.G. § 2B1.1(b)(10)(C) note 8(B).  "The possession

of false document-making implements may constitute sophisticated means, as may creation of

numerous false documents, even if the documents were easily generated and contained only simple falsehoods." Robert W. Haines, Jr., Frank O. Bowman III, & Jennifer C. Woll, Federal Sentencing Guidelines Handbook § 2B1.1, § 27, at 390 (2012-13 ed.).

The Tenth Circuit first addressed the enhancement for sophisticated means in the commission of tax evasion in United States v. Rice, 52 F.3d 843 (10th Cir. 1995).[4]  In United States v. Rice, the defendant received a "tax refund based on excessive withholding that was never in fact withheld." 52 F.3d at 845.  The district court applied the sophisticated-means enhancement, "in part because [the defendant] contested the IRS' ability to require him to produce documents during the civil phase of his case." 52 F.3d at 849.  The Tenth Circuit held that the defendant's tax evasion scheme was not sophisticated, because it was "the functional equivalent of claiming more in itemized deductions than actually paid." 52 F.3d at 849.  In so holding, the Tenth Circuit noted that, if the defendant's scheme was sophisticated, then "every fraudulent tax return will fall within that enhancement's rubric."  United States v. Rice, 52 F.3d at 849. In United States v. Guidry, 199 F.3d 1150 (10th Cir. 1999), the Tenth Circuit concluded that the district court's application of the sophisticated-means enhancement was appropriate, even though the defendant did not use a sham corporation or offshore bank accounts.  See 199 F.3d at 1158.

Alternatively, the defendant in United States v. Guidry made her embezzlement particularly difficult to detect by using checks that were made payable to a bank, not to herself, which are harder to trace; by only depositing a small fraction of her embezzled funds in a bank, which made her embezzlement difficult for the IRS to investigate; and by never withdrawing more

---

[4]The Sentencing Guidelines' enhancement for the use of sophisticated means in the commission of offenses falling under U.S.S.G. § 2B1.1 and U.S.S.G. § 2T1.1 are identical, save for the explanatory examples provided for applying the enhancement under U.S.S.G. § 2B1.1. Compare U.S.S.G § 2B1.1, cmt. n.8(B), with U.S.S.G. § 2T1.1, cmt. n.4.

than $10,000.00 in one day, which demonstrated that she knew that depositing any more would require the bank to notify the IRS of the deposit, and thus further demonstrated that she understood how to use sophisticated means to conceal her embezzlement.  See 199 F.3d at 1158.  The Tenth Circuit held that using multiple storage units to hold items purchased with embezzled funds had a similar effect, and that her case was not simply one of representing to have paid withholding taxes not paid or not disclosing one's income.  See United States v. Guidry, 199 F.3d at 1158 (citing United States v. Rice, 52 F.3d at 849; United States v. Stokes, 998 F.2d 279, 282 (5th Cir. 1993)).  Similarly, in United States v. Tilga, 824 F. Supp. 2d 1295 (D.N.M. 2011)(Browning, J.), the Court found that an enhancement for the defendant's use of sophisticated means was warranted where the defendant used offshore accounts and shell companies to evade taxes by hiding the amount of money she earned.  See 824 F. Supp. 2d at 1330-34.  The Court explained that the application notes to the sentencing guidelines regarding the use of sophisticated means recognizes that the enhancement applies because of the inherent complexity of the entities a defendant uses, and not because a defendant used the entities "in an especially complex or novel manner."  824 F. Supp. 2d at 1330-31.  Moreover, the Court explained that the caselaw addressing the use of sophisticated means does not require that a defendant create the sophisticated means, but, rather, "[t]here is nothing in the comments or the case law to suggest that a person must create the sophisticated means to qualify for the enhancement."  824 F. Supp. 2d at 1332.

Here, Pangburn's actions are more similar to United States v. Rice than to United States v. Guidry.  Pangburn used her role in preparing payroll deposits for Local 953 to create additional, unauthorized deposits to her bank account.  See Plea Agreement ¶ 9, at 4.  The transactions were relatively simple -- she duplicated her weekly wage payments to herself in her own name.  See PSR ¶ 18, at 5.  She did not go to great efforts to execute the fraud, but rather did no more than

simply duplicate payments in QuickBooks, a relatively basic accounting program.[5]  Her scheme thus is "the functional equivalent of claiming more" in salary than she actually earned,  United States v. Rice, 52 F.3d at 849, because Pangburn did not use carefully calibrated transaction amounts or payment schedules that would render detection difficult, as the defendant did in United States v. Guidry, 199 F.3d at 1158.

Similarly, contrary to the USPO's assertion, Pangburn did not use sophisticated means to avoid detection.  The USPO points to Pangburn's voiding the transactions in QuickBooks as evidence of her sophisticated means.  Pangburn's method, however, did not remove the transactions from QuickBooks, but rather relabeled them.  See PSR ¶ 18, at 5.  As further evidence that her concealment is not sophisticated, Local 953's accountant "quickly" detected the unauthorized payments by just reading the QuickBooks account.  PSR ¶ 19, at 5.  That Pangburn made the checks to herself, rather than using a shell account or a third party, allowed the accountant to identify easily the unauthorized payments.  See PSR ¶¶ 18-19, at 5.  This conduct is not nearly as elaborate as the conduct United States v. Guidry, in which the defendant made her embezzled checks payable to a bank, and not to herself, and did so in amounts calculated to avoid detection.  See 199 F.3d at 1158.  It is true that Pangburn made the unauthorized payments to herself in roughly the same amount as her earned wages, thus potentially making detection difficult.  See PSR ¶ 18, at 5.  Local 953's accountant, however, could determine easily that Local 953 did not double her salary, and her method did not escape quick detection.  In United States v. Snow, 663 F.3d 1156 (10th Cir. 2011), the § 2B1.1(b)(10)(C) enhancement was properly applied to a

---

[5] QuickBooks markets its software for its simplicity, providing that there is "no need to be an accounting expert" to use the program.  Intuit Quickbooks, "Accounting for Business," https://quickbooks.intuit.com/?sc=seq_intuit_qb_click_nav (last accessed May 25, 2020).

defendant who deceived numerous competent financial institutions, using means that "fool[ed] trained and experienced bank and closing personnel."  663 F.3d at 1163.  Recoding obvious payments in QuickBooks, as Pangburn did, deceived no one who examined the QuickBooks account.  Indeed, it appears that she avoided detection for two months, not because of steps that she took, but rather because no one was monitoring the QuickBooks account.  Accordingly, Pangburn did not use sophisticated means in committing or concealing her offense.

The USPO also points to the missed payments to the IRS and various other scheduled recipients as evidence of Pangburn's sophistication, because, had Pangburn made these payments, her fraudulent payments would have been discovered more quickly.  See Addendum at 2. Pangburn denies that she missed these payments for nefarious reasons, however, attributing the missed payments instead to her lack of training and to the fact that Local 953 had previously overpaid the IRS.  See PSR ¶ 18, at 5.  "'The government carries the burden of proving by a preponderance of the evidence that an enhancement is appropriate.'" States v. Delossantos, 680 F.3d at 1219 (quoting United States v. Johnson, 130 F.3d 1420, 1430 (10th Cir. 1997)).  The USPO's allegation regarding the missed IRS payments is based on inference; the USPO does not point to evidence of Pangburn's intent, but rather notes that, had she made the payments, Local 935's account would have been depleted.  See Addendum at 2.  Pangburn did not admit to any such facts in her Plea Agreement, however, and also provides a plausible justification for the missed payments.  Accordingly, the Court concludes that a preponderance of the evidence does not demonstrate that Pangburn missed the payments as a means of avoiding detection.  Further, missing the payments to avoid detection is not sophisticated.  These missed payments did not render it any less simple for Local 953's accountant to detect Pangburn's unauthorized payment. Further, by providing herself unauthorized payments from a finite account, Pangburn naturally

directed funds from legitimate recipients to herself.  As in <u>United States v. Rice</u>, if Pangburn's failure to pay the IRS is sophisticated, then every embezzlement would "fall within the enhancement's rubric."  <u>United States v. Rice</u>, 52 F.3d at 849.

**II.      THE COURT SUSTAINS THE OBJECTIONS TO THE § 3B1.3 ENHANCEMENT.**

Section 3B1.3 of the Guidelines, entitled "Abuse of Position of Trust or Use of Special Skill," provides:

> If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels.  This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic.  If this adjustment is based upon an abuse of a position of trust, it may be employed in addition to an adjustment under § 3B1.1 (Aggravating Role); if this adjustment is based solely on the use of a special skill, it may not be employed in addition to an adjustment under § 3B1.1 (Aggravating Role).

U.S.S.G. § 3B1.3.  Section 3B1.3's "primary concern . . . is to penalize defendants who take advantage of a position that provides them freedom to commit or conceal a difficult-to-detect wrong."  <u>United States v. Guidry</u>, 199 F.3d at 1160 (quoting <u>United States v. Koehn</u>, 74 F.3d 199, 201 (10th Cir. 1996))(internal quotation marks omitted).  To establish abuse of a position of trust for purposes of § 3B1.3's 2-level upward adjustment, the United States must prove: (i) "the person occupies a position of trust," and (ii) "the position of trust was used to facilitate significantly the commission or concealment of the crime."  <u>United States v. Spear</u>, 491 F.3d at 1153 (citing <u>United States v. Morris</u>, 286 F.3d 1291, 1295 (11th Cir. 2002)).

The Application Note to § 3B1.3 defines "public or private trust" as "a position of public or private trust characterized by professional or managerial discretion (<u>i.e.</u>, substantial discretionary judgment that is ordinarily given considerable deference)."  U.S.S.G. § 3B1.3 note 1. The Application Note explains that, "[f]or this adjustment to apply, the position of public or private

trust must have contributed in some significant way to facilitating the commission or concealment of the offense."  U.S.S.G. § 3B1.3 note 1.  Another Application Note for section 3B1.3 discusses union employees and provides that, "[i]f the offense involved theft or embezzlement from a labor union and the defendant was a union officer or occupied a position of trust in the union (as set forth in 29 U.S.C. § 501(a)), an adjustment under this section for an abuse of position of trust will apply."  U.S.S.G. § 3B1.3 note 5(B).  Section 501(a) of Title 29 of the United States Code provides that "[t]he officer, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group."  29 U.S.C. § 501(a).  Section 402(q) further defines "[o]fficer, agent, shop steward, or other representative" as "elected officials and key administrative personnel, whether elected or appointed (such as business agents, heads of departments or major units, and organizers who exercise substantial independent authority), but does not include salaried nonsupervisory professional staff, stenographic, and service personnel."  29 U.S.C. § 402(q).

Pangburn does not meet these definitions and so does not satisfy § 3B.1.3's first prong. See United States v. Spear, 491 F.3d at 1153.  As for § 3B1.3's incorporation by reference of statutorily defined union positions, Pangburn was not a key administrative employee, elected official, organizer, or board member for Local 953.  She was an office manager.  See Plea Agreement ¶ 8, at 3.  Nor did Pangburn's job responsibilities suggest that she held a position of special trust.  The USPO notes that Local 953 entrusted Pangburn with sole responsibility to manage its payroll.  See Addendum at 3.  That no one at Local 953 supervised her work does not mean that Pangburn held a position of special trust.  The Tenth Circuit has noted that § 3B1.3's application "has little to do with trustworthiness and everything to do with authority and discretion."  United States v. Spear, 491 F.3d at 1154.  Pangburn had minimal discretion in her

- 19 -

role, which was primarily administrative.  See Plea Agreement ¶ 8, at 3-4.  Such a role runs counter

to the Guidelines' characterization of public trust as "substantial discretionary judgment that is

ordinarily given considerable deference."  U.S.S.G § 3B1.3, Application Note 1.  Pangburn's job

responsibilities were simple: she initiated transactions for scheduled payments.  See Plea

Agreement ¶ 8, at 3.  Her supervisors decided the payments, and Pangburn initiated them.  See

PSR ¶ 14, at 4.[6]  Pangburn certainly violated Local 953's trust, a fact that the Court will consider

in determining Pangburn's sentence, but she did not hold a position of special trust as § 3B1.3

requires.

    Similarly, Pangburn did not use special skill in her embezzlement.  The same reasons that

justify § 2B1.1(b)(10)(C)'s inapplicability also counsel against § 3B1.3's applicability.  See

U.S.S.G. § 3B1.3 (providing that the § 3B1.3 enhancement may not be used in addition to an

enhancement "if an abuse of trust or skill is included in the base offense level or specific offense

characteristic").  The Application Note to § 3B1.3 defines "special skill" as "a skill not possessed

by members of the general public and usually requiring substantial education, training or

licensing," and lists as examples "pilots, lawyers, doctors, accountants, chemists, and demolition

experts." U.S.S.G. § 3B1.3 n.4.  As discussed, the skills required to direct additional payment in

QuickBooks is minimal, and, if Pangburn possessed special QuickBooks skills that would enable

her to evade detection, she did not use them.  Pangburn has a high school education and attended

---

[6]The PSR states that Pangburn "had sole authority to make the QuickBooks entries and arrange for direct deposits."  PSR ¶ 14, at 4.  The PSR's characterization of Pangburn's job demonstrates, however, that it is more proper to characterize Pangburn as having sole responsibility to make the QuickBooks entries, because she did not decide wages or payment amounts.  See PSR ¶ 14, at 4 (providing that Pangburn had no authority to sign or write checks, but rather required her supervisors' authorization); id. ¶ 15, at 4 (providing that Pangburn required her supervisors' authorization to determine the amount that Local 953 owed in paying bills).

a short training seminar on QuickBooks after she began embezzling funds from Local 953.  See PSR ¶ 88, at 14.  Although § 3B1.3 does not require "formal education or licensing," United States v. Hinshaw, 166 F.3d 1222, 1999 WL 9762, at *3 (10th Cir. Jan. 12, 1999)(unpublished table opinion), the skill "'must be more than the mere ability to commit the offense,'" United States v. Burt, 134 F.3d 997, 999 (10th Cir. 1998)(quoting United States v. Young, 932 F.2d 1510, 1513 (D.C. Cir. 1991)).  Pangburn employed no special skill beyond her ability to initiate the QuickBooks transactions.  Given QuickBooks' simplicity, the general public likely would be capable of committing Pangburn's offense without "substantial education, training or licensing." U.S.S.G. § 3B1.3 n.4.  Accordingly, the Court sustains the Objections to § 3B1.3.

IT IS ORDERED that: (i) the United States' Combined Objections to Presentence Report and Sentencing Memorandum, filed April 9, 2020 (Doc. 19), is sustained insofar as the United States objects to the PSR's enhancement applications;[7] and (ii) the Objection to Presentence Report, filed April 21, 2020 (Doc. 21), is sustained.

_____
UNITED STATES DISTRICT JUDGE

Counsel:

John C. Anderson
  United States Attorney
Benjamin J. Christenson
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

  *Attorneys for the Plaintiff*

---

[7]In the U.S. Objections, the United States also responds to Pangburn's Sentencing Memorandum, filed May 13, 2020 (Doc. 22).  See U.S. Objections at 5-7.  The Court will address the parties' arguments regarding the Sentencing Memorandum at Pangburn's sentencing hearing.

Kari Converse
  Federal Public Defender
Federal Public Defender's Office
Albuquerque, New Mexico

*Attorneys for the Defendant*